UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CR-20562-WILLIAMS

UNITED STATES OF AMERICA

vs.

GUILLERMO BARRERA LARA,

      Defendant.
_____/

## FACTUAL PROFFER

The United States of America, GUILLERMO BARRERA LARA, and his counsel agree that, had this case proceeded to trial, the United States would have proven the following facts, among others, beyond a reasonable doubt:

In June of 2018, co-defendant PABLO AMEZCUA DORADOR was introduced to a law enforcement confidential source ("CS") via telephone. AMEZCUA and the CS met in Panama City, Panama, on June 18, 2019. CS told AMEZCUA that he worked for Colombian cocaine traffickers, and needed drug proceeds moved out of the United States. AMEZCUA stated that he owned a financial firm in Mexico and had mechanisms in place to move the money for the CS. During this same meeting, AMEZCUA told the CS that he wanted to introduce the CS to heroin traffickers form whom he (AMEZCUA) laundered money. CS responded that he was looking to obtain heroin, and explained how he could dilute pure heroin to maximize profits in the United States. CS offered AMEZCUA a commission of $65,000 for each kilogram that he could obtain for CS, and AMEZCUA agreed. The men discussed additional potential money laundering and drug trafficking that they could engage in, and agreed to meet a second time in Guatemala.

On July 19, 2019, the CS and AMEZCUA had a second meeting in Guatemala City, Guatemala. Prior to the meeting, AMEZCUA had also arranged for a Mexican heroin trafficker,

identified only as "Adrian," to come to the meeting. The CS met with AMEZCUA and the heroin trafficker, who stated that he was a member of a Mexican drug cartel. The CS, AMEZCUA, and Adrian discussed exchanging heroin for cocaine in Miami. AMEZCUA and Adrian then spoke privately, and AMEZCUA returned and told the CS that Adrian would do business with the CS, but that it had to go through AMEZCUA.

During this same meeting, AMEZCUA and the CS also discussed money laundering activities, and AMEZCUA stated that he had a friend named Guillermo BARRERA LARA ("BARRERA") who could be used to facilitate money laundering in Mexico. The CS told AMEZCUA that he had a Mexican-Lebanese client who had accumulated approximately $15-$16 million from the sale of cocaine in Miami, and needed to move the money out of the United States. AMEZCUA and the CS also discussed using airplanes owned by BARRERA and a yacht owned by AMEZCUA to move money out of the United States.

On July 24, 2019, AMEZCUA and BARRERA met the CS at the Opa-Locka Airport, in Miami, Florida, and drove to a restaurant. The CS stated that he needed to launder $17 million of drug proceeds out of the United States. AMEZCUA and BARRERA discussed the percent commissions they would charge to assist the CS, and used a calculator to show the CS that he would receive $11.7 million after they took their commissions. BARRERA then explained that he would use the $11.7 million to construct a real estate development in Tulum, Mexico. BARRERA brought the CS a portfolio, including blueprints and design plans, for that resort. Further discussions of possible future money laundering followed.

During this meeting, the CS also discussed heroin smuggling, stating that BARRERA and AMEZCUA would have to prove their trustworthiness by helping him smuggle heroin into the United States. BARRERA agreed to allow the CS to use his plane, and AMEZCUA agreed to let

2

the CS to use his yacht to smuggle heroin from the Bahamas to Miami. The CS gave a detailed explanation about how each kilogram would be diluted prior to distribution, and stated that he would pay BARRERA and AMEZCUA a commission for aiding in smuggling the heroin to the United States.

On August 5, the CS, BARRERA, and AMEZCUA had a fourth meeting in Miami to plan the heroin trafficking and money laundering. They agreed that BARRERA and AMEZCUA would move their plane and yacht, respectively, to the Bahamas, where each would be loaded with five kilograms of heroin. BARRERA and AMEZCUA would send the vessels containing the heroin to Miami, where it would be received and sold by the CS. Once back in the United States, the CS would load BARRERA's plane with $17 million in cash narcotics proceeds. BARRERA and AMEZCUA would then meet the CS, receive approximately $300,000 for their role in smuggling the heroin, and fly the additional $17 million back to Mexico, where they would launder it and invest it in real estate as discussed in prior meetings.

On August 19, the CS met with AMEZCUA and BARRERA in the Bahamas. AMEZCUA showed the CS where to hide the five kilograms of heroin on his yacht and BARRERA showed the CS where to hide the five kilograms of heroin his plane. The CS then took the men to his hotel and showed them ten kilograms of sham heroin. Later that night, the CS hid five kilograms of sham heroin each in the places directed by AMEZCUA and BARRERA.

On August 20, AMEZCUA's yacht, a 40-foot Sea Ray Sundancer yacht, hull number SERF077H506, departed the Bahamas with the five kilograms of sham heroin departed for the United States. Later that same day, BARRERA's plane, a Cessna Citation 500 plane, serial number 500-0198, with Mexican tail number XB-TRN, departed the Bahamas and landed at the

3

Opa Locka Airport in Miami with five kilograms of sham heroin on board. AMEZCUA's yacht arrived in Miami the following day, August 21.

AMEZCUA and BARRERA arrived in Miami on board a commercial airplane later in the day on August 21. After they arrived, the CS picked them up in a car to drive them to their hotel. The CS asked whether he could use another airplane owned by BARRERA to bring 30 kilograms of heroin to New York, to which AMEZCUA and BARRERA agreed. The men agreed they would meet the following day, August 22, so that the CS could pay AMEZCUA and BARRERA their share of the heroin trafficking proceeds and load the additional $17 million in narcotics proceeds on a second plane owned by BARRERA to smuggle to Mexico. Specifically, AMEZCUA and BARRERA requested $300,000 of their narcotics proceeds to be given to them in person so they could go shopping in Bal Harbour, and the remaining proceeds to be hidden onto the plane. AMEZCUA also specifically confirmed that the $17 million in narcotics would be hidden on the plane.

On August 22, AMEZCUA and BARRERA met the CS at the Opa-Locka Executive Airport. The CS provided BARRERA with a small bag that purported to contain $100,000, which BARRERA placed aboard one of his planes. The CS then brought BARRERA and AMEZCUA a second bag and showed them the inside of the bag, which purported to contain $300,000 in U.S. currency. AMEZCUA and BARRERA took the bag, at which point they were arrested by law enforcement.

Post-*Miranda*, both AMEZCUA and BARRERA were advised of their *Miranda* rights and agreed to speak to law enforcement. Both men confessed to their involvement in the money laundering and drug smuggling activities detailed above.

These facts are sufficient to prove the Defendant's guilt of Count 1 of the Indictment beyond a reasonable doubt.

Date: 3/10/20

By: _____
DANIEL J. MARCET
ASSISTANT UNITED STATES ATTORNEY

Date: 03-10-20

By: _____
OSCAR ARROYAVE
COUNSEL FOR DEFENDANT

Date: 03-10-20

By: _____
GUILLERMO BARRERA LARA
DEFENDANT